

# In the Missouri Court of Appeals
# Eastern District

DIVISION FOUR

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED101542 |
| | ) | |
| Appellant/Cross-Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| vs. | ) | |
| | ) | Honorable Jimmie M. Edwards |
| AMERICAN TOBACCO CO., ET AL., | ) | |
| | ) | |
| Respondents/Cross-Appellants. | ) | FILED: September 22, 2015 |

The State of Missouri ("Missouri") appeals from the trial court's Amended Order and Judgment denying Missouri's motion to vacate the Non-Diligence Award and confirming the Final Award entered in the 2003 Non-Participating Manufacturers' ("NPMs") Adjustment Arbitration. Missouri also appeals from the trial court's judgment denying Missouri's motion to compel a single-state arbitration between only it and the Participating Manufacturers ("PMs") of cigarettes and other tobacco products, which entered into a Master Settlement Agreement ("MSA") with Missouri and fifty-one other States and U.S. Territories ("States"), to determine whether Missouri diligently enforced its "Qualifying Statute" in 2004. The PMs cross-appeal from the trial court's modification of the Settlement Award, ordering the Independent Auditor ("IA") to treat the twenty Signatory States whose diligence was contested, but not required to be proven, as non-diligent when calculating the NPMs' Adjustment applicable to the amount owed to Missouri for 2003. We reverse.

## I. Background

This case began in 1997 – approximately eighteen years ago – when Missouri filed suit against several tobacco companies for health care costs and other damages imposed upon the state by cigarette smoking. State ex rel. Nixon v. American Tobacco Co., Inc., 34 S.W.3d 122, 125 (Mo. banc 2000); "ABCs of the Tobacco Master Settlement Agreement," www.naag.org/publications/naagazette/volume_1_number_2; Master Settlement Agreement, http://www.naag.org/assets/redesign/files/msa-tobacco/MSA.pdf. Around the same time, more than forty states commenced similar litigation, asserting various consumer protection claims for monetary, equitable, and injunctive relief against certain tobacco product manufacturers and others as defendants. "ABCs of the Tobacco Master Settlement Agreement," www.naag.org/publications/naagazette/volume_1_number_2; Master Settlement Agreement, http://www.naag.org/assets/redesign/files/msa-tobacco/MSA.pdf.

In November 1998, more than forty states and territories ("States") reached a "landmark agreement," known as the MSA, with four major manufacturers in the cigarette industry, known as the "original" Participating Manufacturers ("OPMs").[1] Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 533 (2001). Since 1998, more than forty "subsequent" Participating Manufacturers ("SPMs") have joined the MSA under similar terms as the OPMs.[2] (Collectively, OPMs and SPMs are referred to as "PMs"). The MSA was approved by the circuit court in March 1999.

In the MSA, the "Signatory States"[3] settled their consumer protection claims against the tobacco companies in exchange for monetary payments and permanent injunctive relief,

---

[1] The major tobacco companies included in the OPMs are Lorillard, Philip Morris, R.J. Reynolds, and Brown & Williamson Tobacco Corp.
[2] A listing of PMs can be found at "Participating Manufacturers under the Master Settlement Agreement as of June 12, 2015," *available at* http://www.naag.org/assets/redesign/files/Tabacco/2015-06-12%20PM%20List.pdf.
[3] The Signatory States include 46 states (all but Mississippi, Minnesota, Florida, and Texas, which settled separately with major tobacco companies), the District of Columbia, Puerto Rico, and territories of the Virgin Islands, American Samoa, Guam, and the Northern Mariana Islands.

designed to reduce cigarette smoking in the U.S. and compensate, in part, for the health care costs associated with treating tobacco-related diseases under state Medicaid programs. "ABCs of the Tobacco Master Settlement Agreement," http://www.naag.org/publications/naagazette/volume_1_number_2/the_abcs_of_the_tobacco_master_settlement_agreement.php. In exchange for the States' release of their claims against the PMs, the MSA requires PMs to permanently restrict targeting youth through their advertising, marketing, and promotion of tobacco products, to make annual payment of billions of dollars to the States in perpetuity, and to contribute $1.5 billion to establish what has become the American Legacy Foundation, an entity dedicated to counter-advertising and public education against cigarette smoking. MSA, *available at* http://www.naag.org/assets/redesign/files/msa-tobacco/MSA.pdf (hereinafter "MSA").

The MSA sets forth the specific amount all PMs agree to pay the States each year based on their relative market share, subject to a number of adjustments calculated by an Independent Auditor ("IA"). MSA, § IX.[4] The adjustment at the center of this dispute is the Non-Participating Manufacturer ("NPM") Adjustment found in Section IX of the MSA, which potentially can reduce the payments to the States. Once the IA calculates all the adjustments, the PMs make their annual payments to an escrow agent, which then apportions the funds to each State according to its previously negotiated "allocable share." MSA, Exhibit A. Missouri's allocable share is 2.2746011%, meaning that each year Missouri receives approximately 2.27% of the total annual payments made by the PMs. MSA, Exhibit A.

---

[4] These adjustments include the Inflation Adjustment, the Volume Adjustment, the Previously Settled States Reduction, the Non-Settling States Reduction, the Non-Participating Manufacturer ("NPM") Adjustment, the offset for miscalculated or disputed payments described in subsection XI(i), the Federal Tobacco Legislation Offset, the Litigating Releasing Parties Offset, and the offsets for "claims-over" described in subsections XII(a)(4)(B) and XII(a)(8). MSA, § IX(c).

Based on 2002 sales, the PMs were obligated to pay the States approximately $6.4 billion on April 15, 2003. Of that amount, Missouri's share was approximately $146 million.

*Non-Participating Manufacturer Adjustment.*

Some tobacco manufacturers elected not to participate in the MSA; these Non-Participating Manufacturers ("NPMs") are not required to make annual payments to the States, nor are they bound by the MSA's advertising restrictions. The NPMs could theoretically price their cigarettes at lower and more competitive rates than the PMs, and thus undermine the MSA's public health goals by shifting market share from the PMs to NPMs. The MSA, however, attempts to ameliorate this cost disparity between PMs and NPMs by giving PMs an "NPM Adjustment," an adjustment which can lower the PMs' payment obligation to the States if two conditions are met:

1) The PMs suffer a "Market Share Loss," meaning that in considering the national market (not the market in any given State), the PMs' market share decreased by more than two percentage points as compared to 1997 levels; and

2) The IA finds that the MSA was a "significant factor" contributing to that national Market Share Loss.

MSA, §§ IX(d)(1)(A), (B)(iii), (C). If both conditions are met, the NPM Adjustment lowers the PMs' payment obligation that year by three times the percentage of national market share that the PMs lost in excess of the 2% threshold. The NPM Adjustment percentage is deducted from every State's MSA payment on a *pro rata* basis according to its allocable share. MSA, § IX(d)(2). The NPM Adjustment allows an individual State to avoid losing its allocable share of the NPA Adjustment by enacting and "diligently enforcing" model legislation, also called a "Qualifying Statute."[5] States that diligently enforce their Qualifying Statute do not have their

---

[5] The legislation requires NPMs selling products in the state to escrow funds to pay future judgments on a per-cigarette basis roughly equivalent to the PMs' per cigarette payment under the MSA. MSA, § IX(d)(2)(E). The

4

annual MSA payments reduced by the NPM Adjustment percentage.  Additionally, when a State diligently enforces its Qualifying Statute, the amount that its payment would have been reduced via the NPM Adjustment (had it not diligently enforced its Qualifying Statute) is reallocated among all other States that did not enact and diligently enforce their own model legislation. MSA, §§ IX(d)(2)(B)-(D).  Thus, the diligent States' incentive is that the non-diligent States are collectively responsible for the total available adjustment, including what would have been the shares of the diligent States; the fewer the number of non-diligent States, the greater the amount of the adjustment that each non-diligent State must bear.  A non-diligent State's total loss from the NPM Adjustment (after reallocation) is capped at the amount of its annual payment from the PMs.  MSA, § IX(d)(2)(C).

*NPM Adjustment Disputed for 2003*

In 2003, the PMs lost more than two percent of their 1997 national market share to NPMs and the potential NPM Adjustment for the OPMs alone was roughly $1.148 billion.  Missouri's original allocable share of the 2003 NPM Adjustment was approximately $26 million.  The reallocation process could have cost Missouri up to its full 2003 MSA payment of $146 million if it had been the only State found non-diligent.

The IA determined that no NPM Adjustment should be applied because the States' diligent enforcement had not yet been determined, also indicating that it believed it lacked the authority to decide the diligent enforcement issue.  The IA sent the dispute to binding arbitration in accordance with subsection XI(c) of the MSA, which requires that the parties submit to a "binding arbitration" of "[a]ny dispute . . . arising out of or relating to . . . any determinations made by[] the Independent Auditor (including, without limitation, any dispute concerning . . .

---

MSA contains a model Qualifying Statute.  MSA, Exhibit T.  Missouri enacted its Qualifying Statute on July 1, 1999.  Section 196.1000-1003, RSMo.

any of the adjustments . . . described in subsection IX(j) . . . )," one of which is the NPM Adjustment.

When the States refused to arbitrate, Missouri asked the circuit court to enter a declaratory judgment "construing the term 'diligently enforced'" under Missouri law, so as to establish the standard to be applied to a determination in the future dispute. Missouri argued that the court retained jurisdiction to construe and enforce terms of the MSA and to declare the meaning, under Missouri law, of any disputed term contained therein.

The PMs, however, filed a motion to compel arbitration. The court cited the following arbitration clause under the MSA's subsection XI(c), which addresses the calculation and disbursement of payment:

> Resolution of Disputes. Any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor (including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection XI(j) or subsection XI(i)) shall be submitted to binding arbitration before a panel of three neutral arbitrators, each of whom shall be a former Article III federal judge. Each of the two sides to the dispute shall select one arbitrator. The two arbitrators so selected shall select the third arbitrator. The arbitration shall be governed by the United States Federal Arbitration Act.

Thus, on January 22, 2007, the court granted the PMs' motion to compel arbitration and held that "the question of whether a Qualifying Statute is being diligently enforced" falls within the "clear" "language" of the NPM's arbitration provision, because it "arises out of and relates to" the IA's NPM Adjustment "calculations and determinations." In addition to the dispute resolution provisions applicable to the disbursement of payments in subsection XI(c) of the MSA, the court also cited exceptions to its jurisdiction found in subsection IX(d), the NPM Adjustment, including the exclusion for diligent enforcement of the Qualifying Statute; and subsection XVII(d), the payment of attorneys' fees. The courts of 47 MSA States also ordered

6

arbitration (only Montana's courts disagreed).  McGraw v. Am. Tobacco Co., 681 S.E.2d 96, 103 n.7, 108-12 (W. Va. 2009).

The PMs sought to induce Missouri and the other States to agree to participate in a national arbitration before a single panel for the purpose of determining whether the 2003 NPM Adjustment applied, and if so, which states had failed to diligently enforce their Qualifying Statute and would therefore bear the burden of that downward adjustment to their MSA payments.  An "Agreement Regarding Arbitration" was signed in December 2008 by Missouri and nearly all the other States.  In this agreement, the PMs agreed to, among other things, some incentives for the States:  1) a liability reduction of 20% for any State ultimately found non-diligent by the arbitration panel; and 2) to release more than $500 million held in a disputed payments account.

Arbitration convened with fifty-one of the fifty-two MSA States in July 2010 to address the issue of whether the PMs were entitled to an NPM Adjustment and whether any State was entitled to an exemption to the NPM Adjustment for 2003 due to "diligent enforcement" of its Qualifying Statute.[6]  An arbitration panel of three retired federal judges was selected to resolve the 2003 NPM Adjustment dispute (the "Panel").  The States picked Hon. Abner J. Mikva (D.C. Cir.), and the PMs picked Hon. William G. Bassler (D.N.J.).  The two judges then chose Hon. Fern M. Smith (N.D. Cal.).

For nearly two years, the PMs and the States conducted extensive discovery, briefed numerous issues, and appeared before the Panel for hearings on various matters in cities around the country.  The Panel entered various preliminary rulings concerning its interpretation of the NPM Adjustment provisions at issue.  Preliminarily, the Panel interpreted the MSA to provide

---

[6] Montana did not participate in national arbitration because its court retained jurisdiction over its dispute with the PMs.

that a State whose diligence for 2003 was contested in the arbitration would bear the burden of proving its diligence at its evidentiary hearing if it wanted to avoid the NPM Adjustment, because "the party seeking to establish a contractual exception has the burden of proving that exception." To find a presumption of diligent enforcement would read terms into the MSA that are not there. The Panel interpreted the MSA to provide that the IA may not allocate any part of the NPM Adjustment to any State "unless and until" that State is found non-diligent. The Panel also referred to its earlier Burden of Proof Order, agreeing that "the Panel's finding that the States have the burden to establish diligent enforcement does not" mean either (1) that a State's non-diligence must be presumed or (2) that part of the Adjustment is to be allocated to a State "unless and until" it proves its diligence. Additionally, the Panel interpreted the MSA to provide that, if a State's diligent enforcement was no longer contested after discovery, the State would be deemed to be diligent and its share of the Adjustment would be reallocated to those States that the Panel found were non-diligent. The Panel further held that the Burden of Proof Order addresses only the "narrow question" of "which party has the burden of proof at the arbitration hearing," and thus does not "come[] into play" where a State's "claim of diligent enforcement is not challenged." Thus, the Panel agreed with several of the States that "[p]roof is unnecessary where the claim is uncontested."

On November 3, 2011, the PMs issued a "no-contest" determination to twelve states and four territories (the "No Contest States"). Before the individual State hearings began, the Panel afforded each State the opportunity to contest the diligence of any other State, because the States found non-diligent would bear the shares of the Adjustment of any States whose diligence was not contested. However, no State contested the diligence of any of the sixteen No-Contest

8

States.[7] Subsequently, the Panel ruled that a State whose diligence was not contested by either the PMs or any of its sister States would be deemed diligent for purposes of the allocation and reallocation of the 2003 NPM Adjustment. To determine the diligence of the thirty-five remaining States (the "Contested States"), the Panel held an initial evidentiary hearing on common issues in April 2012, followed by state-specific evidentiary hearings from May 2012 through May 2013.[8]

Missouri's hearing regarding its diligent enforcement was held first, over a four-and-a-half-day period. On the first day, the Panel attempted to verify that none of the Contested States (including Missouri) had asserted claims challenging the diligence of any No-Contest States. Missouri's counsel responded that the Panel was correct, but there was "one caveat":

> There was some discussion early on as to whether sometime late in the arbitration the PMs might decide to let out additional States rather than continuing to contest them. At that point, we will have already passed the deadline for us to file a contest, so we simply ask to reserve the right to be able to do at that time.

The Panel responded, "Sure."

During Missouri's hearing, the PMs introduced testimony of two expert witnesses and one lay witness, while Missouri relied on testimony from five lay witnesses.

Following Missouri's hearing, eighteen other states tried their cases before the arbitration Panel; in twelve of those hearings, statements and arguments regarding Missouri's enforcement efforts were heard without the presence of Missouri's counsel.

*NPM Adjustment Settlement and Resolution*

---

[7] Missouri's Amended Motion for Vacatur and Declaratory Relief states that "[n]o State chose to contest the diligence of the 16 No Contest States, however, because even the PMs—with every incentive to dispute it—believed they were diligent." The OPMs, however, allege that no State availed itself of the opportunity to contest the diligence of any other State.

[8] The Panel itself "recognize[d], as a general proposition, that the delay in the diligent enforcement determinations is not good. When the MSA was executed, it is likely that no party believed that diligent enforcement determinations would drag out as much as eight years (2003 determination being made in 2011)."

9

Prior to the completion of all hearings, nineteen States and the PMs agreed to a settlement (the "Partial Settlement") and three more later joined. All other States, (including Missouri), were invited to join but declined. The twenty-two "Signatory States" to the Partial Settlement had a combined allocable share of approximately 46%.[9] The twenty-seven "Non-signatory States," including Missouri, objected to the Partial Settlement, claiming that the settlement prejudiced them because there now would not be determinations of the Signatory States' diligence for purposes of reallocating the 2003 NPM Adjustment, and that the settlement would violate the MSA unless all the Signatory States that the PMs had contested were treated as non-diligent for purposes of reallocating the NPM Adjustment. On March 12, 2013, the arbitration Panel entered a "Stipulated Partial Settlement and Award" rejecting the objections. The Panel determined that the Signatory States would be treated as "not subject to the 2003 NPM Adjustment," but that the reallocation among any Non-signatory States found to be non-diligent would be reduced by the Signatory States' "pro rata share" of approximately 46%. The Panel determined that the Non-signatory States would not be prejudiced by the Partial Settlement if their NPM Adjustment was reduced accordingly. The Panel suggested that any objecting State, found by the Panel to be non-diligent, should appeal to its MSA Court if it had "a good faith belief that the pro rata deduction [did] not adequately compensate them for a Signatory State's removal from the re-allocation pool . . ."

On September 11, 2013, the arbitration Panel then issued final awards for fifteen States whose diligence for 2003 still remained contested and had had hearings. Nine States were found diligent, while six States (including Missouri) were found non-diligent.

---

[9] The twenty-two Signatory States consisted of twenty States that had been contested by the PMs up to that point, plus two States that the PMs previously had determined to no longer contest.

Missouri's annual payment, which was to be payable on April 15, 2014, would have been $130 million if there had been no NPM Adjustment for 2003. Instead, Missouri's payment was reduced by $20 million due to the *pro rata* amount of the NPM Adjustment attributable to Missouri, and then it was further reduced by another $50 million due to the reallocation of the NPM Adjustment attributable to the diligent States, resulting in a net payment to Missouri of $60 million.

*Missouri's Appeal*

Missouri filed a motion on December 10, 2013, asking the circuit court to vacate the Partial Settlement to the extent that it affects Missouri, vacate Missouri's final award, and order related declaratory relief through a single-state arbitration involving only Missouri and the PMs. Missouri asked that the court specify how the IA should calculate Missouri's share of any NPM Adjustment for 2003 or later years, declaring that Missouri's share of any NPM Adjustment must be calculated as though the Signatory States to the Partial Settlement were still required, per the Panel's own reading of the MSA, to either (a) prove their diligence, or (b) pay their share of the NPM Adjustment. Additionally, on December 30, 2013, pursuant to Section 435.355, RSMo, 9 U.S.C. 2 and subsection XI(c) of the MSA, Missouri moved for the trial court to compel the PMs to arbitrate in a single-state proceeding on the question of whether Missouri diligently enforced its Qualifying Statute in 2004 and is therefore exempt from the 2004 NPM Adjustment.[10]

On June 2, 2014, in its Amended Order and Judgment, the circuit court found that, although the Panel had the authority to determine the reallocation method, the "*pro rata*" reallocation method is "clearly erroneous" because it violates the MSA's procedure for amending the MSA. The court cited the MSA's subsection IX(d)(2), which states that an NPM Adjustment

---

[10] As we discuss in greater detail, infra, Missouri does not advocate for a single-state arbitration proceeding with respect to the 2003 NPM Adjustment because it signed an Agreement Regarding Arbitration to allow for national arbitration. Missouri did not agree to national arbitration, however, beginning in 2004.

11

"shall apply" to "all" Settling States "except" those that "continuously had a Qualifying Statute . . . in full force and effect . . . and diligently enforced the provisions of such statute during such entire calendar year." The court found that the Stipulated Partial Settlement and Award "effectively amends § IX(d)(2), since the signatory states are no longer subject to the NPM Adjustment and do not have to prove their diligent enforcement." Because Missouri and other Non-signatory States did not agree to such amendment of the calculation of their annual payment, the court modified the settlement award and ordered the IA to treat the 20 Signatory States whose diligence was contested, but not proven, as non-diligent when calculating the NPM Adjustment applicable to the amount owed to Missouri for 2003. Further, the court denied Missouri's motion to vacate the final award, finding that Missouri had not shown that the arbitration Panel was "unduly influenced by any *ex parte* communication in other states' hearings," and the "abundant evidence in the Missouri record" supported the finding that Missouri failed to diligently enforce its escrow statute in 2003.

Finally, the court denied Missouri's motion to compel a single-state arbitration to determine whether Missouri diligently enforced its Qualifying Statute in 2004, reasoning that although the court agreed the States' interests are not the same in that each State has a vital and conflicting interest to show that other States are also non-diligent, the court did not believe that it necessarily meant the States were not on one "side" of the dispute. The court stated:

> The court frequently sees cases where there are more than two parties involved. There may be numerous defendants, for instance, whose interests are conflicting and adverse to each other. Nonetheless, they are "aligned" as party defendants, and, in that sense, are "one side."
>
> The two "parties" to the MSA are the "Participating Manufacturers" and the "Settling States." See MSA p.3, and terms defined on p.11-12 and p.15. It is clear that these two groups are the "two sides" envisioned by the arbitration provision, and all the Settling States collectively comprise one side.

12

The trial court distinguished the case at hand from Baesler v. Continental Grain Co., 900 F.2d 1193 (8th Cir. 1990), in that here, there is only one agreement to arbitrate to which all States are a party. Continental Grain included separate contracts with arbitration agreements, however, and when one of the producers attempted to consolidate the separate arbitration proceedings, the producer was criticized accordingly.

For 2004, Missouri has conceded that both of the conditions precedent to an NPM Adjustment have been satisfied. The question remaining, then, is whether Missouri's 2004 MSA payment should be reduced by the NPM Adjustment amount, based on whether Missouri diligently enforced its Qualifying Statute in 2004.

Missouri, as the Appellant, filed its appeal with this Court with regard to the trial court's denial of Missouri's motion to compel a single-state arbitration of Missouri's diligent enforcement of its Qualifying Statute for 2004.

On cross-appeal, the PMs, including OPMs and SPMs, argue the trial court erred in its modification of the arbitration Panel's settlement award with regard to the 2003 NPM Adjustment.

## II. Discussion

*A. Trial Court's Modification of Award for 2003*

We begin with the PMs' two points related to the trial court's modification of the settlement award with regard to the 2003 NPM Adjustment. First, the PMs allege the trial court erred because the court went beyond the permissible scope of judicial review, in that (A) the MSA incorporates the Federal Arbitration Act's standard of review, which in this case requires showing that the arbitrators exceeded their powers and forecloses second-guessing the merits of their good-faith contract interpretation, and (B) the arbitrators did not exceed their powers in

13

their good-faith interpretation that the MSA adopts the *pro rata* method, and the court held otherwise only by improperly reviewing that interpretation under a "clearly erroneous" standard.

Secondly, the PMs contend the trial court erred in modifying the settlement award because the court's holding that the *pro rata* ruling was "clearly erroneous" is based on a misinterpretation of the contract, in that (1) the arbitrators reasonably interpreted the MSA in light of case law to provide for the *pro rata* judgment-reduction method after a partial settlement, and (2) the court's conclusion that the arbitrators "clearly" "amended" the MSA by not deeming all of the contested Signatory States non-diligent is an interpretation that would confer on Missouri a massive windfall lacking any basis in the MSA's text, in judgment-reduction case law, or in the facts, and that is further belied by the State's own contrary prior position.

*1. Standard of Review*

Initially, we note that both the United States Congress and the Missouri General Assembly have enacted arbitration legislation. Edward D. Jones & Co. v. Schwartz, 969 S.W.2d 788, 793 (Mo. App. W.D. 1998). The Federal Arbitration Act ("FAA") is found at 9 U.S.C. § 1, et seq. (1970), and the Missouri Arbitration Act ("Missouri Act") appears at § 435.350 et seq. Both express the liberal policy of enforcing arbitration agreements as a matter of law "to further the important public policy of resolving disputes without resort[ing] to the courts." Schwartz, 969 S.W.2d at 793; Dunn Indus. Group, Inc. v. City of Sugar Creek, 112 S.W.3d 421, 427 (Mo. banc 2003). Whereas arbitration is an alternative to litigation, judicial oversight of arbitration is narrow and strictly limited. CPK/Kupper Parker Communications, Inc. v. HGL/L. Gail Hart, 51 S.W.3d 881, 883 (Mo. App. E.D. 2001); Western Waterproofing Co., Inc. v. Lindenwood Colleges, 662 S.W.2d 288, 291 (Mo. App. E.D. 1983).

14

We find the FAA is applicable here, where the parties bargained that "[t]he arbitration shall be governed by the United States Federal Arbitration Act," MSA, subsection XI(c), in a settlement involving commerce.

Judicial review of the merits of an arbitrator's award is conducted under an extremely deferential standard of review. Brown v. Brown-Thill, 762 F.3d 814, 818 (8th Cir. 2014). In reviewing arbitration proceedings, appellate courts will not consider claims that arbitrators committed factual or legal errors, as they would in reviewing decisions of lower courts. Shop 'N Save Warehouse Foods, Inc. v. United Food & Commercial Workers Int'l Union, 61 F.3d 632, 634 (8th Cir. 1995). Because arbitration awards are favored, the party challenging the award is not entitled to have reconsideration of the merits and bears the burden of demonstrating the invalidity of the award, which consists of objective facts inconsistent with impartiality. Brown, 762 F.3d at 818-19.

Section 10(a) of the FAA sets out four grounds upon which an arbitration award may be vacated:

> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10. Similarly, the Missouri Uniform Arbitration Act gives five bases under which an arbitration award may be vacated, only one of which is relevant here: if "[t]he arbitrators exceeded their powers." Section 435.405.1(3), RSMo (2000). An arbitration award may also be set aside under the FAA if it is made in "manifest disregard of the law," a judicially created basis

for vacating an arbitration award.[11] <u>Maxwell-Gabel Contracting Co., Inc. v. City of Milan</u>, 147 S.W.3d 93, 97 (Mo. App. W.D. 2004). Furthermore, Section 11 of the FAA explains that modification or correction of an award may occur under three separate scenarios:

> (a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award;
> (b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.
> (c) Where the award is imperfect in matter of form not affecting the merits of the controversy.
> The order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties.

9 U.S.C. § 11.

The trial court's determination of whether the arbitrators exceeded their powers is a legal question, which we review *de novo*. <u>Behnen v. A.G. Edwards & Sons, Inc.</u>, 285 S.W.3d 777, 779 (Mo. App. E.D. 2009). A party seeking relief under Section 10(a)(4), which authorizes a federal court to set aside an arbitral award "where the arbitrator[] exceeded [his] powers," bears a heavy burden. <u>Oxford Health Plans LLC v. Sutter</u>, 133 S.Ct. 2064, 2068 (2013). "It is not enough . . . to show that the [arbitrator] committed an error – or even a serious error." <u>Id.</u>, quoting <u>Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.</u>, 559 U.S. 662, 671 (2010). "Because the parties 'bargained for the arbitrator's construction of their agreement,' an arbitral decision 'even arguably construing or applying the contract' must stand, regardless of a court's view of its (de)merits." <u>Oxford Health Plans</u>, 133 S. Ct. at 2068, citing <u>Eastern Associated Coal Corp. v. Mine Workers</u>, 531 U.S. 57, 62 (2000) (quoting <u>Steelworkers v. Enter. Wheel & Car Corp.</u>, 363

---

[11] This federal exception is limited in that the complaining party must establish that the arbitrator understood and correctly stated the law, but ignored it. <u>Hoffman v. Cargill Inc.</u>, 236 F.3d 458, 462 (8th Cir. 2001). An award may not be set aside simply because the arbitrator erred in interpreting the law or in determining the facts. <u>Id.</u> Thus, Missouri also moved the trial court for vacatur under Section 435.405.1 and 435.370(2). While the state and federal laws are nearly identical, we find the FAA controls the arbitration, and its review, in the resolution of disputes under MSA subsection XI(c).

U.S. 593 (1960); Paperworkers v. Misco, Inc., 484 U.S. 29, 38 (1987); internal quotation marks omitted). "Only if the arbitrator act[s] outside the scope of his contractually delegated authority – issuing an award that simply reflect[s] [his] own notions of [economic] justice rather than draw[ing] its essence from the contract – may a court overturn his determination." Oxford Health Plans, 133 S. Ct. at 2068 (internal quotations omitted).

## 2. *The Arbitration Panel's Award*

The arbitration Panel found that a central part of the 2003 NPM Adjustment dispute included issues concerning the MSA reallocation, allocating the 2003 NPM Adjustment among the Non-signatory States in light of the Partial Settlement, and directing the IA to implement those provisions of the Partial Settlement that govern the monetary payments as among the settling parties. Because these issues involved interpretation of the MSA, the Panel held it had jurisdiction to enter the Stipulated Partial Settlement and Award and rule on the objections over the 2003 NPM Adjustment dispute, especially so the settling parties would know whether their Partial Settlement would be given effect.

Among the Panel's rulings, it directed the IA to implement the provisions of the "Term Sheet" settlement. Further, the Panel ordered the 2003 NPM Adjustment to be allocated among the Non-signatory States by reducing the dollar amount by a percentage equal to the aggregate allocable shares of the Signatory States as of the date of the Panel's Final Award (as of the date of the Stipulated Partial Settlement and Award, the percentage of 41.9964405%). The Panel ordered that the IA "will treat the Signatory States as not subject to the 2003 NPM Adjustment for purposes of Section IX(d)(2)(B)-(C) of the MSA" and that the Signatory States' shares of the 2003 NPM Adjustment will be governed by the reallocation provisions of Sections IX(d)(2) and IX(d)(4) of the MSA. Thus, the Signatory States' shares will be reallocated among all Non-

17

Signatory States that did not diligently enforce a Qualifying Statute during 2003 as provided in those provisions of the MSA. The Panel specified that the maximum portion of the 2003 NPM Adjustment that could be applied to a Non-Signatory State remains as provided by Section IX(d)(2)(D) of the MSA.

The Panel explained that "judgment reduction is appropriate and adequate under the MSA and governing law." It noted that where multiple parties have a potential shared contractual obligation and some of them settle and some do not, the non-settling parties cannot necessarily block the settlement, but may be entitled to a judgment reduction. The Panel recognized the three standard methods for reducing judgments against non-settling defendants after a partial settlement: the *pro rata* method, where the court divides the amount of the total judgment by the number of settling and non-settling defendants regardless of each defendant's culpability; proportionate fault, which, after a partial settlement and trial of the non-settling defendants, the jury determines the relative culpability of all the defendants and the non-settling defendant pays a commensurate percentage of the total judgment; and *pro tanto*, where the court reduces the non-settling defendant's liability for the judgment against him by the amount previously paid by the settling defendants, without regard to proportionate fault. In support, the Panel cited the following: See In re Enron Corp. Secs., Deriv. & ERISA Litig., 2008 U.S. Dist. Lexis 48516 , at *20-21 (S.D. Tex. 2008); see In re Masters Mates & Pilots Pens. Pl. Litig., 957 F.2d 1020, 1028 (2d Cir. 1992); In re Jiffy Lube Secs. Litig., 927 F.2d 155, 160-61 & n.3 (4th Cir. 1991). The Panel noted that where non-settling defendants are given the protection of the applicable judgment-reduction method required under the contract and law, they are not prejudiced by the Partial Settlement. See Enron, 2008 U.S. Dist. Lexis 48516, at *60-61; Eichenholtz v. Brennan, 52 F.3d 478, 486-87 (3d Cir. 1996).

18

Construing the parties' contract, the Panel concluded that the MSA reallocation provisions indicate that the *pro rata* method is appropriate. Specifically, the Panel noted that certain provisions use the specific term "*pro rata*," stating that the shares of diligent States are to be "reallocated among all other Settling States *pro rata* in proportion to their respective Allocable Shares." MSA, § IX(d)(2)(C) (emphasis added); see also MSA, § IX(d)(2)(D) ("pro rata in proportion to their respective Allocable Shares"). Further, the Panel noted that the MSA provides that the reallocation is not done on a relative fault basis. The amount of a diligent State's share that is reallocated is its *pro rata* share of the whole, not an amount derived from its particular fault level, the Panel explained. Likewise, the Panel noted, the amount of the reallocated share that a non-diligent State receives is derived from its *pro rata* share of the liable States, not its fault level. For example, if the reallocation of diligent States' shares is done on a *pro rata* basis in this way, the Panel reads the MSA as likewise meaning that a judgment reduction arising from some States' settlement of the diligent enforcement issue should be *pro rata* as well.

As for the objections of the Non-signatory States, the Panel determined they had no grounds to bar entry of the Stipulated Partial Settlement and Award or otherwise bar the settling parties from proceeding with the settlement pursuant to the Term Sheet. The Panel held that the Stipulated Partial Settlement and Award and the Term Sheet of the Partial Settlement do not legally prejudice or adversely affect the Non-Signatory States. Further, the Panel found that the Objecting States' position that all Signatory States must be treated as non-diligent for purposes of the 2003 NPM Adjustment does not reflect any of the standard methods of judgment reduction and would actually produce a considerably larger reduction in the Non-Signatory States' potential obligations than any of the standard methods. The Panel indicated that it is also

19

contrary to the underlying principle of judgment reduction that, because a settlement is not tantamount to an admission of liability, settling defendants are not regarded as necessarily culpable or liable. Whereas the Objecting States argued that any approach by which any State's share is otherwise subject to reallocation is an "amendment" to the MSA requiring their consent, the Panel responded that it is within the Panel's jurisdiction to interpret the MSA contract where it does not speak directly to the process to be used when some States settle diligent enforcement and some do not, and it does so in light of governing law to determine the appropriate process and judgment reduction. Although the Panel found the Partial Settlement's Term Sheet was a settlement of disputes under the MSA rather than an amendment, the Panel noted that the MSA provides that even still, an amendment need only be signed by "all Participating Manufacturers affected by the amendment and by all Settling States affected by the amendment." MSA, § XVIII(j). The Panel construed the term "affected by" to mean "materially prejudiced by" and found that none of the Term Sheet's provisions "affect" the Non-Signatory States within the meaning of the contract.

*3. Trial Court's Ruling*

The trial court found that the "MSA does not expressly address how to reallocate the NPM Adjustment among the non-signatory states where the diligence of the Signatory States is no longer contested due to a settlement; however, the issue is clearly within the scope of the arbitration agreement." The trial court explained that because the Partial Settlement related to the NPM Adjustment, any disputes regarding the Partial Settlement were themselves subject to arbitration. See United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. TriMas Corp., 531 F.3d 531, 539 (7th Cit. 2008) (dispute concerning unionization of workforce at employer's manufacturing plant was held within the scope of

20

arbitration clause in parties' neutrality agreement, which stated that any alleged violation or dispute involving the terms of the agreement could be brought to arbitration). We agree with this statement and find it pivotal in our holding.

The trial court noted its standard for review for vacatur was a determination as to whether the arbitrators exceeded their powers, engaged in misbehavior or misconduct that prejudiced the rights of a party. 9 U.S.C. § 10(a)(3)-(4); 435.405.1, RSMo; Crawford Group, Inc. v. Holekamp, 543 F.3d 971, 978 (8th Cir. 2008). However, the court continued with a discussion of a Pennsylvania court decision favoring the state of Pennsylvania and ordering the IA to treat each settling State that had been contested as if such State did not diligently enforce a Qualifying Statute for purposes of Section IX(d) of the MSA when calculating the amount owed to Pennsylvania for 2003. See Commonwealth ex rel. Kane v. Philip Morris USA, Inc., 114 A.3d 37 (Pa. Commw. Ct. 2015).

The trial court further found that the arbitration Panel's conclusion that the *pro rata* adjustment complied with the MSA and was the equitable way to determine the reallocation method was "clearly erroneous as it violates the MSA's procedure for amending the MSA." The trial court explained that MSA Section IX(d)(2) states that an NPM Adjustment "shall apply" to "all" settling States "except" those that "continuously had a Qualifying Statute . . . in full force and effect . . . and diligently enforced the provisions of such statute during such entire calendar year." The trial court found that the Stipulated Partial Settlement and Award "effectively amends § IX(d)(2), since the [S]ignatory [S]tates are no longer subject to the NPM Adjustment and do not have to prove their diligent enforcement." Whereas Missouri and the other Non-signatory States did not agree to the amendment and are materially affected, the trial court ordered that the

21

twenty Signatory States whose diligence was contested, but not proven, must be treated as non-diligent when calculating the NPM Adjustment for Missouri for 2003.

*4. Analysis*

While the PMs argue that the trial court erred in arbitrarily assigning a "clearly erroneous" standard of review to the arbitration Panel's *pro rata* adjustment, Missouri contends that the arbitration Panel's first mistake in exceeding its authority was in construing the MSA's provision regarding amendments, and that the provisions were not part of the dispute actually referred to arbitration. Missouri argues the MSA's arbitration clause, subsection XI(c) does not submit to arbitration disputes arising out of the construction or application of the MSA's clause that bans any non-unanimous amendments that "affect" the parties to the MSA.

Although their arguments take different routes, the question to be answered is the same: whether the arbitration Panel's release of the Partial Settlement's Signatory States, or "Term Sheet States," from bearing a share of the NPM Adjustment liability reallocated from all States that prove diligence was a proper exercise of the Panel's authority.

The substance and validity of an arbitration clause is governed by the usual rules and canons of contract interpretation. Dunn Indus. Group, Inc. v. City of Sugar Creek, 112 S.W.3d 421, 428 (Mo. banc 2003). In construing arbitration clauses, courts have categorized them as "broad or narrow." Id. A broad arbitration provision covers all disputes arising out of a contract to arbitrate; a narrow provision limits arbitration to specific types of disputes. Id. Where an arbitration clause is broad and contains no express provision excluding a particular grievance from arbitration, only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail. Id. at 429.

The general rule under the FAA is that "[o]nce it has been determined that a substantive dispute is arbitrable, the arbitrators normally have the authority to decide all matters necessary to dispose of the claim." Ross Bros. Const. Co., Inc. v. Int'l Steel Srvs., Inc., 283 F.3d 867, 875 (7th Cir. 2002). Just as the Panel explained, subsection XI(c) of the MSA compels "binding" arbitration of "[a]ny dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the [IA] (including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations," including the NPM Adjustment described in subsection XI(i). Further, subsection IX(d) on payments of the NPM Adjustment explains the calculation of the NPM Adjustment as well as the exception to its application:

> (A) The NPM Adjustment set forth in subsection (d)(1) shall apply to the Allocated Payments of all Settling States, except as set forth below.
>
> (B) A Settling State's Allocated Payment shall not be subject to an NPM Adjustment: (i) if such Settling State continuously had a Qualifying Statute (as defined in subsection (2)(E) below) in full force and effect during the entire calendar year immediately preceding the year in which the payment in question is due, and diligently enforced the provisions of such statute during such entire calendar year; or (ii) if such Settling State enacted the Model Statute (as defined in subsection (2)(E) below) for the first time during the calendar year immediately preceding the year in which the payment in question is due, continuously had the Model Statute in full force and effect during the last six months of such calendar year, and diligently enforced the provisions of such statute during the period in which it was in full force and effect.

MSA, § IX(d)(2).

The trial court found that the MSA's subsection IX(d)(2)'s allocation and reallocation provisions mandated that "[t]hose states who cannot prove diligent enforcement are then hit twice with a reduction in their annual payment: first their payment is reduced by the pro rata amount of the NPM Adjustment allocable to that state, and then the state's payment is reduced

23

again because the amount of the NPM Adjustment that would have otherwise been allocated pro rata to those states who prove diligent enforcement is reallocated to the non-diligent states." Further, the trial court found that up to the moment the Partial Settlement was executed, "[t]he PMs had contested the diligence of 20 out of 22 Signatory States, or over 90%." Then the trial court found that the Stipulated Partial Settlement and Award "effectively amends" the MSA's subsection IX(d)(2) in that the Signatory States are no longer subject to the NPM Adjustment and do not have to prove their diligent enforcement. The court found Missouri was denied the opportunity to protect its MSA rights of contribution from those States and that Missouri's payment was further reduced by another $50 million due to the reallocation of the NPM Adjustment.

Missouri argues that even the PMs admit that the MSA requires the NPM Adjustment to be "reallocated" among all States not found to be diligent, and that the diligence of the States entering into a partial settlement with the PMs, known as the "Term Sheet States" remains unknown. However, the PMs argue that even the trial court conceded that the MSA does not expressly say how to reallocate the NPM Adjustment after a partial settlement. Accordingly, the arbitration Panel reasonably looked for interpretive guidance from the well-established case law of judgment reduction to address the issue of a settlement with only some of the multiple defendants with a shared potential liability.

Both parties argue the applicability Oxford Health Plans here. The Oxford Health Plans Court decided that Oxford chose arbitration, and "must now live with that choice." 133 S. Ct. at 2071. The Court held that under 9 U.S.C.A. § 10(a)(4), the question for a judge is not whether the arbitrator construed the parties' contract correctly, but whether he construed it at all. Id. Because the arbitrator did construe the contract when it decided that the contract authorized class

24

arbitration, the Court decided that the arbitrator did not "exceed his powers." The Oxford Health Plans Court, therefore, did not set aside the arbitral award. 133 S. Ct. at 2065.

Here, the PMs contend Oxford Health Plans makes clear that the Settlement Award's *pro rata* judgment reduction ruling cannot be disturbed under the FAA review standards, because the Supreme Court concluded that the resolution of an arbitrable issue cannot be vacated except in a "very unusual circumstance[]" – namely, where the arbitrator was not "even arguably construing or applying the contract," but rather was willfully implementing "his own notions of economic justice." 133 S. Ct. at 2068. Missouri, on the other hand, contends that Oxford Health Plans is distinguishable in that the parties had specifically authorized the arbitrator to interpret the arbitration clause, which provided that "any and all" of their disputes were subject to arbitration. Id. at 2067, 2071. Instead, Missouri highlights the Oxford Health Plans Court's admonition that vacatur is appropriate where "the arbitrator act[s] outside the scope of his contractually delegated authority – issuing an award that simply reflects [his] own notions of [economic] justice rather than draw[ing] its essence from the contract." Id. at 2068 (internal citations and punctuations omitted). Thus, in answering whether the Panel's Stipulated Partial Settlement and Award construed by the arbitrators were "within the areas marked out for his consideration," Missouri argues it is undisputed that the Panel exceeded its authority by "construing" provisions of the MSA that were not part of the dispute these parties submitted to its jurisdiction for arbitration, namely the language of Section XVIII(j) on amendments that "affect" MSA parties.

Indeed, this Court's decision hinges on the standard of review set forth by Oxford Health Plans, 133 S. Ct. at 2068. While we find that the Panel's decision regarding amendments to the MSA and construing the term "affect" does extend beyond the scope of the Panel's authority to resolve disputes related to calculations made by the IA, we do not find that the Panel's core

25

ruling on how to treat a partial settlement when calculating the NPM Adjustment exceeds the Panel's authority under the MSA's subsection XI(c). The trial court correctly found that the "MSA does not expressly address how to reallocate the NPM Adjustment among the non-signatory states where the diligence of the Signatory States is no longer contested due to a settlement; however, the issue is clearly within the scope of the arbitration agreement." The trial court explained that because the Partial Settlement related to the NPM Adjustment, any disputes regarding the Partial Settlement were themselves subject to arbitration. We agree and find that, while the Panel is specifically authorized to step in and resolve disputes related to the calculations and determinations performed by the IA (MSA, § XI(c)), and the NPM Adjustment calculation is delineated in the MSA, § IX(d), the MSA does not contemplate the current situation where several of the "contested" States settled with the PMs. Because of the Partial Settlement, there was no determination as to whether those Signatory States diligently enforced a Qualifying Statute and there will be no such determination. We find it is within the Panel's authority under the MSA to determine how to treat the "Term Sheet" Signatory States and reallocate the NPM Adjustment liability in light of the Partial Settlement, which was not anticipated at the time the PMs and States entered into the MSA. Such authority exercised by the Panel is a means of resolving the dispute related to the IA's determinations under the MSA, subsection XI(c), and an extension of the NPM Adjustment calculations in the MSA, subsection IX(d), not an amendment to the MSA. The Panel was correct in finding the Term Sheet Partial Settlement was not an "amendment" of the MSA, but a settlement of disputes under the MSA's subsection XI(c). "Because the parties 'bargained for the arbitrator's construction of their agreement,' an arbitral decision 'even arguably construing or applying the contract' must stand, regardless of a court's view of its (de)merits." Oxford Health Plans, 133 S. Ct. at 2068, citing

26

Eastern Associated Coal Corp., 531 U.S. at 62 (quoting Steelworkers, 363 U.S. at 599; Paperworkers, 484 U.S. at 38; internal quotation marks omitted). "Only if the arbitrator act[s] outside the scope of his contractually delegated authority – issuing an award that simply reflect[s] [his] own notions of [economic] justice rather than draw[ing] its essence from the contract – may a court overturn his determination." Oxford Health Plans, 133 S.Ct. at 2068 (internal quotations omitted). The Panel's extension of its ruling to hypothetically allow for an amendment to the MSA was not necessary or proper to achieve the same result. In stark contrast, the trial court's modification of the Panel's award under a "clearly erroneous" standard had no basis under the correct FAA standard applicable here.

Thus, we next determine whether the Panel "even arguably" construed the provisions submitted by the parties to arbitration, and did not simply issue an award reflecting its own notion of economic justice rather than drawing from the essence of the contract. Again, we glean guidance from Oxford Health Plans' standard, where the Panel's decision was an "interpretation[]" of the parties' agreement" "through and through," as it "focused on the [contract's] text in light of the applicable "default rule[s]." Id. at 2069-70. Here, without any hint of using its own notions of economic justice, the Panel explained how it reached its decision through case law of post-settlement judgment reduction.

Courts analyze settlement agreements according to general principles of contract law. Cody v. Hillard, 304 F.3d 767, 778 (8th Cir. 2002); Mid Rivers Mall, L.L.C. v. McManmon, 37 S.W.3d 253, 255 (Mo. App. E.D. 2000). "The cardinal rule in the interpretation of a contract is to ascertain the intention of the parties and to give effect to that intention." J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club, 491 S.W.2d 261, 264 (Mo. banc 1973); see also Monarch Fire Protection Dist. of St. Louis County v. Freedom Consulting & Auditing Servs., 644 F.3d 633,

27

638 (8th Cir. 2011). Where the parties have expressed their final agreement in writing and there is no ambiguity in the contract, the parol evidence rule requires that the court determine the intent of the parties solely from the four corners of the contract itself. Mid Rivers Mall, 37 S.W.3d at 255. Contracts are ambiguous only if the language may be given more than one reasonable interpretation. Id. at 256. Simply because parties disagree over the meaning of a contract does not mean that it is ambiguous. Id.

A latent ambiguity will be found to exist when a contract on its face appears unambiguous, but some collateral matter makes the meaning uncertain. Alack v. Vic Tanny Int'l of Missouri, Inc., 923 S.W.2d 330, 337 (Mo. banc 1996). In such situations, courts will consider external matters in order to determine the true intent of the parties. Id. "Where a contract is ambiguous, recourse must be had to evidence of external matters, bearing in mind the cardinal principle that the object is to determine the true intent of the parties." Boswell v. Steel Haulers, Inc., 670 S.W.2d 906, 913 (Mo. App. W.D. 1984). "Appropriate for consideration are the relationship of the parties, the circumstances surrounding execution of the contracts, the subject matter of the contracts, the acts of the parties in relation to the contract and any other external circumstances which would cast light on the intent of the parties." Id., citing N.B. Harty Gen. Contractors, Inc. v. W. Plains Bridge & Grading Co., Inc., 598 S.W.2d 194, 197 (Mo. App. S.D. 1980). "Moreover, unless a contract provides otherwise, the law applicable thereto at the time and place of its making, including statutory provisions and judicial precedents, is as much a part of the contract as though it were expressly referred to and incorporated in its terms." Sadler v. Bd. of Educ. of Cabool Sch. Dist. R-4, 851 S.W.2d 707, 712 -13 (Mo. App. S.D. 1993).

Here, although the MSA is clear on its face how to allocate the NPM Adjustment, it fails to mention how to treat contested states in the instance of a Partial Settlement prior to

28

determining whether a State diligently enforced its Qualifying Statute.  Despite the MSA's appearance of unambiguity, we find the MSA is latently ambiguous in its silence on the issue of a Partial Settlement when allocating the NPM Adjustment.  See Gas Aggregation Servs., Inc. v. Howard Avista Energy, LLC, 319 F.3d 1060, 1065 ("the arbitrator must utilize other sources to determine the parties' intent" where "the written agreement is silent" or "there is no clear and unambiguous agreement").  The Panel thus attempted to determine the true intent of the parties by considering the relationship of the parties, the acts of the parties in relation to the contract, the practical construction the parties themselves have placed on the contract by their acts and deeds, and any other external circumstances that cast light on the intent of the parties.  In re Cook, 504 B.R. 496, 504 (B.A.P. 8th Cir. 2014) (citing Busch & Latta Painting Corp. v. State Highway Comm'n, 597 S.W.2d 189, 198 (Mo. App. W.D. 1980)).  Accordingly, the Panel looked to the case law of post-settlement judgment reduction.

In McDermott, Inc. v. AmClyde, 511 U.S. 202, 209-14 (1994), the United States Supreme Court discussed different approaches in calculating non-settling defendants' liability with reference to a jury's allocation of proportionate responsibility[12], rather than by giving the non-settling defendants a credit for the dollar amount of the settlement.  The Court stated that in choosing among the alternatives, certain considerations were paramount:  consistency with the proportionate fault approach of United States v. Reliable Transfer, 421 U.S. 397 (1975)[13], promotion of settlement, and judicial economy.  McDermott, Inc., 511 U.S. at 211.  The American Law Institute has identified three principal alternatives and, after noting that "[e]ach has its drawbacks and no one is satisfactory," decided not to take a position on the issue.  Id., at

---

[12] The phrase "proportionate share approach" is also used for the term "*pro rata*," which is often used to describe the same approach.  McDermott, Inc., 511 U.S. at 210 n.9; Associated Elec. Co-op., Inc. v. Mid-America Transp. Co., 931 F.2d 1266, 1269 (8th Cir. 1991).

[13] In maritime law, Reliable Transfer began a rule requiring that damages be assessed on the basis of proportionate fault when such an allocation can reasonably be made.  McDermott, Inc., 511 U.S. at 208.

208, citing Restatement (Second) of Torts § 886A, pp. 343-44 (1977). The Court concluded that the *pro tanto* approach with the right of contribution against the settling defendant is "clearly inferior" because it discourages settlement and leads to unnecessary ancillary litigation. McDermott, Inc., 511 U.S. at 211. It further found the *pro tanto* method without contribution against the settling tortfeasor, even when supplemented with good-faith hearings, is likely to lead to inequitable apportionments of liability, contrary to Reliable Transfer. Id. at 212. The Court ultimately decided the proportionate share approach was superior to either of the *pro tanto* approaches in encouraging settlement, furthering the interests of judicial economy, and in keeping consistent with the rule of proportionate fault. Id. at 216-17. "Though McDermott was decided in the context of an admiralty case, its discussion of setoff issues did not involve issues or arcane concepts grounded on matters unique to maritime actions." Harrington v. Wilber, 743 F. Supp. 2d 1013, 1020 (S.D. Iowa 2010) (internal citations omitted). Prior to that, the Eighth Circuit Court of Appeals adopted the "proportional fault approach," which reduced claims of plaintiffs by a *pro rata* share of the settling tortfeasor's liability for damages. Associated Elec. Co-op., Inc. v. Mid-Am. Transp. Co., 931 F.2d 1266, 1269 (8th Cir. 1991).

As discussed in its Stipulated Partial Settlement and Award, the Panel reviewed cases such as In re Masters Mates & Pilots Pens. Pl. & IRAP Litigation, 957 F.2d 1020, 1028 (2d Cir. 1992), in which the court discussed the different methods of post-judgment reduction and weighed the policy favoring settlement of claims by injured plaintiffs against the need to protect the rights of non-settling defendants. The case emphasizes that the need for fairness of the settlement to the settling parties is not enough; where the rights of third parties are affected, their interests must be considered in order to earn judicial approval. Id. at 1026. The Panel also cited In re Jiffy Lube Securities Litigation, which noted a circuit split in rulings for which setoff

30

method should be adopted.  927 F.2d 155, 160-61 (4th Cir. 1991).  The Panel cited Eichenholtz v. Brennan, which also describes cases involving multiple defendants and how the right to contribution inhibits partial settlement.  52 F.3d 478, 486-87 (3d Cir. 1996).

Furthermore, other surrounding circumstances may cast light on the intent of the parties at the time of contracting.  The Panel particularly noted that the MSA used *pro rata* allocations, especially in connection with the NPM Adjustment merits determinations, and "fundamentally, . . . provides that the reallocation is not done on a relative fault basis."  Specifically, MSA subsection IX(d)(2)(C) states that the shares of diligent States are to be "reallocated among all other Settling States *pro rata* in proportion to their respective Allocable Shares." (Emphasis added).  Additionally, the MSA's subsection IX(d)(2)(D) further mentions "pro rata in proportion to their respective Allocable Shares."  The Panel took a logical step after noting that the amount of a diligent State's share that is reallocated is its *pro rata* share of the whole, and the amount of a reallocated share that a non-diligent State receives is derived from its *pro rata* share of the liable States, and fault was not an issue.  Thus, the Panel drew from the "essence of the contract" in construing it to likewise mean that a judgment reduction arising from a Partial Settlement of the diligent enforcement issue should be *pro rata* as well.

Moreover, the Panel rejected the PMs' arguments that the NPM Adjustment should be reduced *pro tanto*, which would have a substantially smaller reduction in potential liability for the States that did not settle.  The Panel also rejected the States' argument that each settling Signatory State should be treated as if it would lose the diligent enforcement determination, although the States conceded that at least some of the settling states likely would be found diligent.

31

In sum, it is clear from the Panel's Stipulated Partial Settlement and Award that the Panel took its decision-making role seriously, reviewed the post-settlement judgment reduction law, and made its decision carefully. In Oxford Health Plans, the Supreme Court strongly implied that the arbitrator may have been incorrect in his analysis, but the Court could not overturn the arbitrator's decision based upon a very limited scope of review. "Because the parties 'bargained for the arbitrator's construction of their agreement,' an arbitral decision 'even arguably construing or applying the contract' must stand, regardless of a court's view of its (de)merits." Oxford Health Plans, 133 S. Ct. at 2068, citing Eastern Associated Coal Corp., 531 U.S. at 62 (quoting Steelworkers, 363 U.S. at 599; Paperworkers, 484 U.S. at 38; internal quotation marks omitted). "Only if the arbitrator act[s] outside the scope of his contractually delegated authority – issuing an award that simply reflect[s] [his] own notions of [economic] justice rather than draw[ing] its essence from the contract – may a court overturn his determination." Oxford Health Plans, 133 S.Ct. at 2068 (internal quotations omitted). After a thorough review, we do not suggest that the Panel's analysis was incorrect. Instead, we find the Panel construed the MSA just as it was asked to do – to resolve the dispute regarding the NPM Adjustment, especially in light of a Partial Settlement. Thus, based on the limited standard of review provided by our Supreme Court's precedent, we hold that the trial court erred in vacating and modifying the Panel's award. The PM's first point in their cross-appeal is granted.

## B. *Single-State Arbitration for 2004*

Next, we review Missouri's appeal. Just as the parties disagree as to whether the arbitration Panel acted outside the scope of its contractually delegated authority when it used a *pro rata* reallocation method for the NPA Adjustment among the Non-signatory States following the Stipulated Partial Settlement and Award with the Signatory States in 2003, the parties also

disagree as to whether the trial court should have authorized single-state arbitration between the PMs and Missouri under the MSA.

Missouri raises three points on appeal with regard to the arbitration of Missouri's diligent enforcement of its Qualifying Statute in 2004. In its first point, Missouri alleges the trial court erred when it determined that the MSA arbitration clause requires that the dispute between Missouri and the PMs over Missouri's diligent enforcement of its Qualifying Statute in 2004 be resolved in a collective or class arbitration and then denied Missouri's motion to compel arbitration between only it and the PMs. Missouri contends that determination erroneously applies the law and is against the weight of the evidence in that the plain language of the arbitration clause and the course of conduct of the parties demonstrate that Missouri never consented to collective or class arbitration of this discrete dispute.

Second, Missouri alleges the trial court erred when it denied Missouri's motion to compel the dispute between Missouri and the PMs over Missouri's diligent enforcement of its Qualifying Statute in 2004 into arbitration between only Missouri and the PMs because that ruling is against the weight of the evidence in that a nationwide arbitration has been rendered impossible by the PMs who must be estopped from using their settlement with some but not all States to amend the MSA and extinguish Missouri's rights of contribution from the 22 States that will not and cannot be compelled into a nationwide arbitration for any dispute regarding diligent enforcement during the years 2004 to 2014.

Third, Missouri alleges the trial court erred when it denied Missouri's motion to compel the dispute between Missouri and the PMs over Missouri's diligent enforcement of its Qualifying Statute in 2004 into arbitration between only Missouri and the PMs because it is against the

33

weight of the evidence in that the very nature of a national arbitration will deny Missouri's right to fundamental due process.

*1. Standard of Review*

The standard of review here is essentially the same standard as explained supra. Additionally, on a motion to compel arbitration, before a party may be compelled to arbitrate under the FAA, a court must determine whether a valid agreement to arbitrate exists between the parties and whether the specific dispute falls within the substantive scope of that agreement. Dunn Indus. Group, Inc., 112 S.W.3d at 427-28. Whether a motion to compel arbitration should have been granted is a question of law, which we review *de novo*. See Katz v. Anheuser-Busch, Inc., 347 S.W.3d 533, 539 (Mo. App. E.D. 2011). Although the reviewing court should consider the record below, deference should not be given to the trial court's conclusions. Kinzenbaw v. Dir. of Revenue, 62 S.W.3d 49, 52 (Mo. banc 2001). A court must compel arbitration if it determines that the parties agreed to arbitrate the dispute. Dunn Indus. Group, Inc., 112 S.W.3d at 428. A motion to compel arbitration of a particular dispute should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute. Id. at 429. Doubts as to arbitrability should be resolved in favor of coverage. Id. Policies favoring arbitration, however, are "not enough, standing alone, to extend an arbitration agreement beyond its intended scope because arbitration is a matter of contract." Kohner Props., Inc. v. SPCP Group VI, LLC, 408 S.W.3d 336, 346 (Mo. App. E.D. 2013) (internal citations omitted). "Accordingly, express provisions excluding particular grievances from arbitration are enforceable." Id., quoting Manfredi v. Blue Cross and Blue Shield of Kansas City, 340 S.W.3d 126, 131 (Mo. App. W.D. 2011).

*2. Analysis*

34

As explained in the previous section, supra, disputes regarding the calculations and determinations made by the IA, such as application of the NPM Adjustment, specifically fall within the arbitration clause of the MSA:

> Resolution of Disputes. Any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor (including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection XI(j) or subsection XI(i) shall be neutral arbitrators, each of whom shall be a former Article III federal judge . . . . The arbitration shall be governed by the United States Federal Arbitration Act.

MSA, § XI(c). Included within this category is the question of diligent enforcement of a Qualifying Statute. Again, however, the arbitration clause is silent as to whether the arbitration must be conducted collectively with all States in a nationwide arbitration, or done in a single-state fashion. The trial court concluded that the MSA's arbitration clause implies that Missouri consented to arbitrate collectively. After our review of the record, we disagree with the trial court's conclusion.

The FAA places arbitration agreements on an equal footing with other contracts, and courts will examine arbitration agreements in the same light as they would examine any contractual agreements. Triarch Indus., Inc. v. Crabtree, 158 S.W.3d 772, 776 (Mo. banc 2005). The "usual rules of state contract law and canons of contract interpretation apply when examining arbitration agreements. Dunn, 112 S.W.3d at 428. "The guiding principle of contract interpretation under Missouri law is that a court will seek to ascertain the intent of the parties and to give effect to that intent." Triarch Indus., Inc., 158 S.W.3d at 776. The intent of the parties to a contract is presumed to be expressed by the ordinary meaning of the contract's terms. Id. If the contract is unambiguous, it will be enforced according to its terms; if ambiguous, it will be construed against the drafter.

35

Id. Custom and usage may be used to remove ambiguities. Jake C. Byers, Inc. v. J.B.C. Invs., 834 S.W.2d 806, 817 (Mo. App. E.D. 1992). "In Missouri, where an agreement is silent as to certain necessary matters concerning the arbitration, . . . Missouri will imply such terms." Triarch Indus., Inc., 158 S.W.3d at 775.

In Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., which Missouri relies upon, the United States Supreme Court emphasized that prior case law and the contractual nature of arbitration made it clear that parties may specify *with whom* they choose to arbitrate their disputes. 559 U.S. 662, 683 (2010) (emphasis in original). Although we recognize there are distinctions between Stolt-Nielsen and the case at bar,[14] we nevertheless note its applicability here. Under the "foundational FAA principle" that arbitration is a matter of consent, the Court found that a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so. Id. at 684; see also Oxford Health Plans, 133 S. Ct. 2064, 2066 (2013). The Court held that "silence" on the issue of class arbitration is not enough to presume that, by merely agreeing to arbitrate a dispute, a party consented to multi-party arbitration. Stolt-Nielsen, 130 S. Ct. at 684. The Supreme Court explained:

> An implicit agreement to authorize class-action arbitration, however, is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate. This is so because class-action arbitration changes the nature of arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator. In bilateral arbitration, parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes. . . . But the relative benefits of class-arbitration are much less assured, giving reason to doubt the parties' mutual consent to resolve disputes through class-wide arbitration.

---

[14] For instance, the facts in Stolt-Nielsen are based in maritime law and New York. Procedurally, the arbitration panel in Stolt-Nielsen first determined that the arbitration clause allowed for class arbitration, whereas here, the trial court denied a motion to compel Missouri's single-state arbitration.

Id., 685-86 (internal citations omitted).

In Stolt-Nielsen, the parties stipulated that there was "no agreement" on the issue of class arbitration and the arbitration panel imposed its policy choice for class arbitration. Id. at 668. Here, the evidence demonstrates the parties' intent regarding whether to conduct class or single-state arbitration.

As explained supra, two conditions must be met before the PMs could claim the benefit of the downward NPM Adjustment:

1) The PMs must suffer a "Market Share Loss" – meaning that the PMs' share of the national market decreases by more than two percentage points in that year compared to 1997; and

2) The MSA is determined to be a "significant factor" contributing to that national Market Share Loss.

MSA, §§ IX(d)(1)(A), (B)(iii), (C). If these two conditions are met, the NPM Adjustment applies to decrease the total payments the PMs owe to the States collectively. Id. at §§ IX(d)(2)(A). It was determined that these two national conditions were met for 2004. Thus, the NPM Adjustment will apply to all States for 2004. The remaining question, however, is state-specific: which individual States diligently enforced their individual Qualifying Statute during 2004 and can thus avoid bearing their share of the NPM Adjustment. See id. at §§ IX(d)(2)(A).

Under the MSA's allocation and reallocation provisions, the States are clearly adverse to one another on this issue. The trial court found "there is no question that the states' interests are not the same; if shown to be non-diligent, each state has a vital and conflicting interest to show that other states are also non-diligent." As the trial court stated, we note that States have a "double incentive" to want other States to be found non-diligent. If a State is found diligent, its share of the NPM Adjustment is reallocated to all States found non-diligent (costing the non-

37

diligent States more money).  Additionally, the diligent State is removed from the pool of States among which the diligent States' shares will be reallocated, leaving fewer States to absorb the reallocation amount (costing the non-diligent States even more).  Whereas one State's victory substantially reduces another State's budget, no State can be said to be on another State's "side" in its own diligent enforcement dispute with the PMs.  Nevertheless, instead of granting Missouri's motion to compel a single-state arbitration with the PMs, the trial court denied the motion, finding that multiple PMs and multiple States signed the comprehensive MSA, which was sufficient to construe the arbitration clause's "two sides to the dispute" language to mean that all the PMs were on one side and all the States collectively were on the other side.  We disagree with the trial court and find the plain language of the MSA's arbitration clause, as well as the weight of the evidence on the record, do not suggest the parties' intent to arbitrate collectively.

Interestingly, in 2006 when the PMs moved the trial court to compel Missouri into arbitration regarding whether the 2003 NPM Adjustment could be applied to Missouri or any other State, the PMs argued that the dispute should be arbitrated because "[e]ach [] State has a vital – and conflicting – interest in whether other States are subject to the Adjustment."  The PMs argued that, under the MSA's subsection IX(d)(2)(C), because a diligent State's share of the NPM Adjustment is reallocated to non-diligent States, this causes "a further downward adjustment in the amount [the non-diligent states] receive under the MSA."  Accordingly, the determination regarding diligent enforcement with respect to one State can affect the payments of all other States, the PMs admitted.

Missouri opposed the PMs' 2006 motion to compel arbitration, but in early 2007, the trial court granted the PMs' motion to compel arbitration of the parties' "dispute" in accordance with the terms of the MSA.  The trial court did not then require Missouri to join with any other State's

38

2003 NPM Adjustment dispute with the PMs, nor did it require Missouri to submit to any national or class arbitration proceeding. Instead, the PMs sought to induce Missouri and the other States to agree to participate in the national arbitration before a single panel for the purpose of determining whether the 2003 NPM Adjustment applied at all, and if so, which States had failed to diligently enforce and thus would bear the burden of that downward adjustment to their MSA payments. The PMs offered Missouri and all the other States incentives to join, including a liability reduction of 20 percent for any State ultimately found non-diligent, and a release by the PMs of more than $500 million in disputed funds held in escrow (of which Missouri received a share). The incentives, along with the States' agreement to join the nationwide arbitration, were memorialized in the Agreement Regarding Arbitration. *Missouri agreed to be a part of the nationwide arbitration proceeding* to determine if the NPM Adjustment applied to the States collectively for 2003, and then, if so, determine each State's liability, if any, for that 2003 NPM Adjustment.[15] This Agreement Regarding Arbitration is clear evidence that the MSA arbitration clause itself did not require national arbitration. If it had, the Agreement Regarding Arbitration, including the consideration (of hundreds of millions of dollars) given by the PMs to Missouri and all the other States in order to secure an agreement to national arbitration of the 2003 NPM Adjustment, would not have been necessary at all. Thus, the evidence of the parties' course of conduct contradicts the trial court's finding that a nationwide arbitration was envisioned by the parties in drafting the MSA. Clearly the MSA's arbitration clause did not require national arbitration, and the parties did not intend for the MSA's arbitration clause alone to require so.

Additionally, when the PMs entered into the Partial Settlement with twenty-two States approximately halfway through the 2003 NPM Adjustment arbitration proceeding, the PMs

---

[15] This is distinguished from the only question at issue for 2004: whether Missouri diligently enforced its Qualifying Statute.

changed their course and persuaded the national Panel to disregard the MSA's "unitary payment system" they had argued for during earlier proceedings.[16] No longer did the Panel need to finish the inquiry into the diligence of twenty contested States to determine the remaining States' reallocated shares of any NPM Adjustment that might be awarded. The PMs persuaded the Panel to order immediate payment of disputed funds to the twenty-two States that accepted the Stipulated Partial Settlement, which releases those States from determination of their diligence for at least the years 2004-2014. Implicit is the PMs' concession that diligence determinations by a single arbitral body are not (or at least are no longer) required by the MSA. Diligence determinations rendered by a single-state arbitration panel can be communicated to all interested parties as easily as the Partial Settlement is communicated. Likewise, a "nationwide" arbitration will not take place, regardless, as a result of the Partial Settlement, where twenty-two States accepted the Partial Settlement and no longer have a reason to participate.

Finally, as experience with the 2003 NPM Adjustment collective arbitration shows, a national arbitration appears to have prejudiced Missouri. The Panel had afforded each State the opportunity to contest the diligence of any other State prior to the hearings, and *no* State took advantage of this opportunity to contest Missouri's diligence. However, States supposedly on Missouri's "side" of the arbitration went on the attack during the hearings. The evidence shows that during the 2003 NPM Adjustment arbitration hearings, Missouri's hearing was first.

---

[16] In the PMs' 2006 Motion to Compel Arbitration, the PMs argued that

> the structure of the MSA's payment provisions compels arbitration. The MSA imposes a single, unitary payment obligation on each Participating Manufacturer based on its nationwide sales. A regime in which parties to the MSA could bring multiple judicial challenges to the [IA]'s determinations in 2 MSA courts or ask them to give their respective "interpretations" of the relevant payment provisions, with potentially inconsistent results, could wreak havoc on the MSA's unitary payment system. The [IA] must make its determinations subject to a single set of rules applicable to all states. This is precisely why the MSA expressly carves out an exception to this (and other MSA) Court's jurisdiction for payment-related disputes (MSA § XI(c)), including specifically the NPM Adjustment (MSA §§ XI(d) and XI(c)), and expressly constrains the province of any particular state court to "disputes . . . *within* such Settling State" (MSA § VII(c)(1) (emphasis added)).

40

Subsequently, several States critically compared their diligent enforcement to Missouri's lack thereof, essentially contesting Missouri's diligence as a means to bolster their own. The record shows that eighteen other States tried their cases before the arbitration Panel, and twelve of those States made some reference or argument to Missouri's enforcement efforts without the presence of Missouri's counsel. Missouri's counsel thus could not cross-examine the witnesses whose testimony was used against Missouri.

The trial court likewise found that "[f]ollowing the close of Missouri's hearing, eighteen other states tried their cases before the arbitration panel. In twelve of the eighteen hearings, statements and arguments regarding Missouri's enforcement efforts were heard. Missouri's counsel was not present during these other states' hearings." The PMs further conceded that information about Missouri had been repeated during hearings that occurred after the conclusion of Missouri's hearings. The Panel accordingly made its diligent enforcement determinations not by judging each State in a vacuum, but by comparing each State to the others. Although Missouri asked the trial court to vacate "Missouri's Final Award" regarding the 2003 Panel's finding of non-diligence based on the *ex parte* evidence and argument, the trial court denied Missouri's motion to vacate and Missouri did not appeal that ruling here. However, relevant here are the trial court's conclusions of law requiring arbitrators to afford due process to all parties, and its findings of fact regarding the 2003 Panel's evidence obtained from other States. Simply because this evidence does not meet the high standard for vacating an arbitral award for 2003 (as discussed in the cross-appeal, supra), does not mean the evidence of experience cannot be viewed in weighing the prejudice against Missouri. While Missouri agreed to national arbitration for the 2003 NPM Adjustment, it did not agree to a process that would prejudice Missouri in discussing Missouri's diligent enforcement without Missouri being present in the

41

hearings. Missouri has learned from this experience and accordingly argues against another national arbitration for the 2004 NPM Adjustment. We find that a Missouri-only 2004 arbitration panel, which will determine only Missouri's diligent enforcement without permitting other States an opportunity to compare Missouri to other States' interests, weighs in favor of compelling single-state arbitration. Even though many States joined as one "side" against the PMs when they signed the MSA, a nationwide arbitration where the States conflict with their own "side" without adequate representation infringes upon their due process rights. Because the parties agreed to arbitrate, and the arbitration clause is one that is susceptible to an interpretation that covers this specific dispute, based on the evidence before us, the motion to compel arbitration in a single-state fashion should not have been denied by the trial court.

As evidence of the parties' course of conduct makes apparent, and experience arbitrating the 2003 NPM Adjustment highlights, a nationwide arbitration was not intended by the parties in drafting the MSA and did not serve efficiency and equity. We find the trial court erred in concluding that a nationwide arbitration was envisioned by the parties in drafting the MSA. Moreover, the trial court erred in denying Missouri's motion to compel the PMs into single-state arbitration for Missouri's 2004 diligent enforcement dispute. The parties agreed to arbitrate, so the trial court *was required* to grant the motion to compel arbitration, which was requested as a single-state proceeding. Missouri's appeal is granted.

### III. Conclusion

The judgment of the trial court is reversed and remanded. The trial court is instructed to enter its judgment affirming the arbitration Panel's direction to the IA to implement the provisions of the "Term Sheet" partial settlement and order the 2003 NPM Adjustment to be allocated among the Non-signatory States using a *pro rata* method. The trial court is further

42

instructed to grant Missouri's motion to compel single-state arbitration between Missouri and the

PMs for a determination of diligent enforcement of a Qualifying Statute for 2004.



_____
ROY L. RICHTER, Judge

Patricia L. Cohen, J., concurs
Robert M. Clayton, III, J., concurs

43